HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THEODORE S. DALE,

        Plaintiff,

v.

STATE OF WASHINGTON
DEPARTMENT OF CORRECTIONS,
et al.,

        Defendants.

CASE NO. C11-1042 RAJ

ORDER DENYING
DEFENDANTS' MOTION TO
DISMISS 42 U.S.C. § 1983
CLAIMS

## I. INTRODUCTION

This matter comes before the court on a motion to dismiss plaintiff's 42 U.S.C. § 1983 claims on the basis of qualified immunity filed by individual State defendants Dr. Stuart Andrews, Dr. John David Kenney, Shelli Hudson, Sheryl Allbert, Gayle Jones, and Therese Hutchins[1] (Dkt. # 32; 39-1 (Corrected Mot.)),[2] and a motion to stay and for

---

[1] Dr. Andrews and Dr. Kenney are listed as movants. However, plaintiff's section 1983 claim for deliberate indifference to serious medical needs against Dr. Andrews has been dismissed (Dkt. # 55), and plaintiff does not allege a section 1983 claim against Dr. Kenney in the Second Amended Complaint (Dkt. # 46 at 8). Accordingly, the court only addresses whether Nurses Hudson, Allbert, Jones, and Hutchins are entitled to qualified immunity. Defendants also bring the motion on behalf of John and Jane Does without providing any legal authority to

protective order (Dkt. # 29). Plaintiff argues that disputed issues of material fact regarding the individual defendants' deliberate indifference precludes summary judgment as to whether they are entitled to qualified immunity.[3]

Having considered the memoranda, exhibits, and the record herein, the court DENIES defendants' motion for summary judgment, which renders defendants' motion to stay MOOT.

## II. BACKGROUND[4]

On March 2, 2009, plaintiff approached Nurse Hudson and told her that he had shortness of breath after physical activity, that it had been going on for about two weeks, and that he was not receiving relief from his asthma medication. Dkt. # 35 (Hudson Decl.) ¶ 7; # 52 (Dale Decl.) ¶ 7. Nurse Hudson told him he could either declare a medical emergency then or come into sick call the following day, and she did not chart the encounter. Dkt. # 35 (Hudson Decl.) ¶ 7. On March 3, 2009, plaintiff went to clinic and told Nurse Hudson[5] that he was suffering from the same symptoms he described the day before, and that the symptoms had persisted for two weeks and had gotten worse in the past week. Dkt. # 52 (Dale Decl.) ¶ 7. Plaintiff also told the nurse that his inhaler was not working, and that it was getting harder to catch his breath when he went to

---

support a motion that would require the court to inquire into unknown defendants' culpable state of mind. The court declines defendants' invitation to conduct such an inquiry.

[2] Although the title of defendants' motion is listed as a motion to dismiss, the docket entry labels it a motion for summary judgment. Given defendants' reliance on evidence, and plaintiff's agreement that the summary judgment standard controls, the court will construe the motion to dismiss as a motion for summary judgment. Additionally, although the original motion is at docket number 32, the court has only reviewed defendant's "corrected motion" at docket number 39-1, which was filed the same day.

[3] The court notes that plaintiff has violated Local Rules W.D. Wash. CR 10(e)(5). The court expects the parties to read and abide by all court rules and procedures.

[4] The facts have been summarized in the light most favorable to plaintiff.

[5] Nurse Hudson claims that Kris Sodetani, ARNP, was the mid-level provider to whom she referred plaintiff on March 3, 2009. Dkt. # 35 (Hudson Decl.) ¶ 8. Plaintiff indicates that he told both nurses the same things. Dkt. # 52 (Dale Decl.) ¶ 7.

meals. *Id.* Nurse Sodetani diagnosed activity-related exacerbation of asthma, ordered one treatment of the Albuterol nebulizer in addition to prescribed inhaler, and she ordered a chest x-ray. Dkt. # 35 (Hudson Decl.) ¶ 8.[6]

On March 4, 2009, plaintiff returned to the clinic because his condition had not improved. Dkt. # 52 (Dale Decl.) ¶ 8. He told Nurse Hudson that he was breathing extremely hard without exercise, that he was having difficulty walking to the dining room for meals, and that his medication was having no effect on his condition. *Id.* Nurse Sodetani did not have any available appointments, but Nurse Hudson contacted her and received new orders for one treatment on the DuoNeb nebulizer, which is Albuteral plus another medication that is used to treat asthma. Dkt. # 35 (Hudson Decl.) ¶ 9. Nurse Hudson observed a decreased shortness of breath at rest and after exertion. *Id.*

On March 5, 2009, plaintiff again returned to the clinic because he was having the same problems. Dkt. # 52 (Dale Decl.) ¶ 9. He reported the same symptoms, and told the nurses that he was not getting relief from the treatments from the prior two days. *Id.* Nurse Hudson claims that the report reflects that Nurse Sodetani observed a recent exacerbation of asthma and shortness of breath and ordered DuoNeb nebulizer treatments as needed as frequently as every 6 hours for one week. Dkt. # 35 (Hudson Decl.) ¶ 10.

On March 6, 2009, plaintiff again returned to the clinic, with extreme shortness of breath and with "severe pain in [his] stomach/chest area." *Id.* Nurse Hudson observed that he was short of breath, his skin was pale and moist, his lips were pink, and his nailbeds were pink with positive circulation, movement and sensation. Dkt. # 35

---

[6] The court is unable to read the handwritten charts or determine who the treating providers were based on the handwritten records. To the extent that plaintiff does not dispute the accuracy of the summaries described by the medical providers, the court has relied on the declarations describing the charts. The court also notes that although many of the declarations contain hearsay, the court has focused on the admissibility of the evidence's content, not on the admissibility of the evidence's form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

(Hudson Decl.) ¶ 11. Nurse Hudson claims that plaintiff did not complain of chest pain, but that he complained of upper abdominal discomfort of 7 on a scale of 10. *Id.* Nurse Hudson checked his back and saw no bruising. *Id.* Plaintiff informed Nurse Hudson that the "as needed" treatment was done and that he got a little relief. *Id.* Nurse Hudson conferred with Nurse Sodetani, and noted that while his vital signs were slightly above baseline, it was not emergent, meaning that his condition had remained stable over the week. *Id.* Nurse Hudson instructed him to increase fluid consumption, to rest, and to stop all activity other than to go to meals, while awaiting the results of the chest x-ray. *Id.*

On March 7, 2009, plaintiff declared a medical emergency, and was transported to the Washington State Reformatory ("WSR") in a wheelchair. Dkt. # 52 (Dale Decl.) ¶ 11. Plaintiff claims that he passed out in the shower, woke up on the floor, and a Sergeant and Corrections Officer helped him get up off the floor. *Id.* Plaintiff had trouble standing, was in severe pain in the same area as the day before, and continued to have difficulty breathing. *Id.* Nurse Allbert was the provider on call at the WSR, and she received plaintiff's medical history, complaints, and vital signs from Nurse Gayle Jones. Dkt. # 36 (Allbert Decl.) ¶ 7. Nurse Allbert admits that she never examined plaintiff. *Id.* Her orders were that plaintiff "should push fluids." *Id.* ¶ 8. In the evening, plaintiff returned to the WSR for a medical emergency and complained of continued abdominal pain, shortness of breath, and dizziness when standing. *Id.* ¶ 9. While plaintiff was at the WSR, the nurse called a female Sergeant at the prison and told her plaintiff was just trying to obtain pills. Dkt. # 52 (Dale Decl.) ¶ 12. Plaintiff was sent back to his cell without any examination or treatment. *Id.*; Dkt. # 36 (Allbert Decl.) ¶ 9.

On March 8, 2009, plaintiff declared another medical emergency, and again went to the WSR in a wheelchair. Plaintiff admits that he was highly agitated and angry. Dkt. # 52 (Dale Decl.) ¶ 13. Plaintiff told Nurse Hutchins that he was in severe pain and could not breathe. *Id.* Nurse Hutchins took his vital signs, and found them to be within normal

limits. Dkt. # 37 (Hutchins Decl.) ¶ 7. She told plaintiff that he was not acutely ill and could not go to the emergency room, and that walking would be good for him to keep his lungs open. *Id.* ¶ 8; Dkt. # 52 (Dale Decl.) ¶ 13 ("She told me I was not acutely ill").

On March 9, 2009, plaintiff felt worse. Dkt. # 52 (Dale Decl.) ¶ 14. He was unable to walk to the dining room and fainted again. He was extremely short of breath, dizzy, and was experiencing severe pain in his stomach and chest area. *Id.* In the morning, plaintiff went to the clinic for his appointment with Nurse Sodetani. Dkt. # 35 (Hudson Decl.) ¶ 12. Nurse Hudson took plaintiff's blood sugar and vital signs, performed an EKG, and took his oxygen saturation level. *Id.* Later in the morning, plaintiff saw Dr. Andrews at the request of Nurse Sodetani. Dkt. #38 (Andrews Decl.) ¶ 4. Plaintiff "complained of a low-grade headache, belt-like abdominal discomfort in the upper abdomen, and left axillary line (underarm) chest pain that was continuous and dull achiness, with a pleuritic component (with breathing) that was of the same character but more intense." *Id.* Plaintiff also complained of shortness of breath with exercise, and stated that he got very fatigued and winded walking 10 feet at a normal pace on level ground. *Id.* Dr. Andrews noted no wheeziness, and that he recovered at rest without inhalers. Plaintiff stated that he had no leg swelling, no leg pain, and no past history of heart disease or significant family history of heart disease. *Id.* Dr. Andrews examined plaintiff, measured his heart rate, respiratory rate and oxygen saturation level. *Id.* ¶ 5. Dr. Andrews's assessment was that plaintiff was suffering from oxygen desaturation, extreme fatigue, and shortness of breath with exertion and chest pain with breathing. *Id.* ¶ 6. Dr. Andrews noted that pulmonary embolism was in the differential diagnosis, and ordered that plaintiff be transferred to Valley General Hospital for evaluation in the emergency room. *Id.* At Valley General Hospital, the emergency room doctor found, after several diagnostic tests, that plaintiff suffered from pulmonary emboli. Dkt. # 33-1 at 48-49 (Ex. I to Smith Decl.).

On March 10, 2009, plaintiff was transferred to Providence Everett Medical Center for open heart surgery as a result of his pulmonary embolus. Dkt. # 33-1 at 55-56 (Ex. J to Smith Decl.); Dkt. # 52 (Dale Decl.) ¶ 15. Plaintiff suffered a heart attack while in surgery, but, overall, the surgery was successful. *Id.*

### III. ANALYSIS

**A.  Legal Standard**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.[7] *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). In

---

[7] Defendants have submitted the Declaration of Dr. G. Steven Hammond, M.D. in support of their motion. Dkt. # 34. To the extent Dr. Hammond has summarized the handwritten charts, the court has relied on the providers' declarations who had personal knowledge of the chart notes. It appears to the court that Dr. Hammond's expert opinion deals with the standard of care and plaintiff's claims for medical malpractice. Those issues are not before the court. *See id.* ¶ 5 at 6:5-7. Similarly, the court has disregarded the portions of Dr. Wayne's report that concern plaintiff's medical malpractice claims.

resolving a motion for summary judgment, the court may only consider admissible evidence. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

**B.     Qualified Immunity**

The "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* Whether the officials are entitled to qualified immunity depends on (1) whether the facts that the plaintiffs have alleged or shown make out a constitutional violation and, (2) if so, whether the constitutional right at issue was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[8]

Defendants only argue the first prong of the analysis. Accordingly, the court has only addressed whether plaintiff has made out a constitutional violation.

The prohibition of cruel and unusual punishment in the Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care. *Id.* Eighth Amendment claims involving medical care apply the deliberate indifference standard. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To state a constitutional violation, a prisoner must satisfy a two-part test that has objective and subjective components: (1) the deprivation

---

[8] The Supreme Court modified *Saucier* in *Pearson*, 555 U.S. at 236. Under *Pearson*, the decisional sequence is no longer mandatory.

alleged must be objectively sufficiently serious,[9] and (2) the prison official must have a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834. With respect to the subjective prong, the state of mind is one of deliberate indifference to inmate health or safety. *Id.* Under this standard, the prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the prison official must also draw that inference.[10] *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights. *Id.* However, circumstantial evidence may be used to demonstrate deliberate indifference to medical needs when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm. *Id.* n.4. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). A prisoner need not show his harm was substantial, but a showing of substantial harm would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs. *Id.* If the harm is an isolated exception to the defendant's overall treatment of the prisoner, it ordinarily militates against a finding of deliberate indifference. *Id.*

   1. Nurse Hudson

Nurse Hudson saw plaintiff on March 3, March 4, March 6, and March 9, 2009. During his first two visits with Nurse Hudson, plaintiff complained of difficulty breathing and the ineffectiveness of the medication provided. March 6, 2009 is the first time

---

[9] Defendants do not challenge the objective prong. Accordingly, the court only addresses the subjective prong.

[10] The court notes that the proper inquiry is not, as defendants contend, whether defendants "subjectively knew he was suffering from a pulmonary embolism." Dkt. # 56 (Reply) at 4:2-3. Rather, the proper inquiry is whether they were aware that a substantial risk of serious harm existed.

plaintiff contends that he had severe pain in his stomach and chest. However, plaintiff does not contend that he informed the nurse of either the stomach or chest pain. Nurse Hudson claims that plaintiff did not complain of chest pain, but that he did complain of upper abdominal discomfort of a 7 on a scale of 10.

Dr. Wayne contends that Nurse Hudson did not perform any analysis or provide a diagnosis before declaring plaintiff as not emergent. Dkt. # 53 (Ex. A to Wayne Decl. at 5, 8). However, Nurse Hudson took his vital signs and noted that they were slightly above baseline. The court finds significant that March 6 was the first time plaintiff complained of severe stomach pain, and there is no evidence that plaintiff informed Nurse Hudson of his chest pain on this visit.

Nurse Hudson saw plaintiff again on March 9, 2009. By this time, plaintiff was unable to walk to the dining room, and had fainted twice. He was extremely short of breath, dizzy, and was experiencing severe pain in his stomach and chest area. Nurse Hudson took his vital signs, performed an EKG, and took his oxygen saturation level prior to plaintiff's appointment with Nurse Sodetani. Plaintiff's condition had significantly deteriorated by the seventh day of seeking treatment for his symptoms. His symptoms were serious enough to prompt her to perform an EKG. Dr. Wayne also opines that the "health care providers simply refused to treat him and attempt any diagnostic testing to determine the cause of the condition." Dkt. # 53 (Ex. A to Wayne Decl. at 9). It appears that Dr. Wayne has a different definition of treatment and diagnostic testing than defendants, but has not provided the court with an understanding of what constitutes treatment and diagnostic testing.[11] While Dr. Wayne's report is generalized as to all health care providers (despite the need for a subjective inquiry of each provider), defendants have not provided any evidence that "diagnostic testing" is the

---

[11] Defendants seem to indicate that taking routine vital signs are included within the meaning of diagnostic tests and treatment.

same as a routine taking of a patient's vital signs, or whether an EKG is considered "diagnostic testing." Additionally, it seems that Dr. Wayne has blurred the line of distinction between standard of care, which is relevant for medical malpractice, and deliberate indifference. Regardless of Dr. Wayne's opinions, Nurse Hudson knew that the medication provided for asthma symptoms had not improved plaintiff's condition. She does not dispute that, by the final day, she knew of the severe pain in his chest and stomach. Nurse Hudson does not dispute that she knew that plaintiff had fainted, and was having continued difficulty breathing. A reasonable jury could find that Nurse Hudson was aware of a substantial risk of serious harm, and that the serious risk of harm was obvious given all of plaintiff's symptoms and history over the previous seven days.

The court finds that the evidence before the court raises a triable issue of material fact as to whether plaintiff was experiencing sufficient symptoms that, notwithstanding the steps she did take, Nurse Hudson acted with deliberate indifference in failing to call a physician.[12] *See Johnson v. Dir. of Corr.*, Case No. C05-0298 JAM JFM P., 2008 WL 3374494, *6 (E.D. Cal. 2008).

2. Nurse Allbert and Nurse Jones

Plaintiff declared two medical emergencies on March 7. He was transported to WSR in the morning and in the evening as a result of his medical emergencies. Nurse Allbert was the provider on call at the WSR on March 7. She admits that she never examined plaintiff. Nurse Jones has not provided a declaration describing her role. It appears that she was the nurse who took plaintiff's vital signs on March 7 at the WSR. That day, plaintiff fainted in the shower, had trouble standing, was in severe pain in his

---

[12] The court notes that this is not a case where defendants have based their actions "on a medical judgment that either of two alterative courses of treatment would be medically acceptable under the circumstances." *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Rather, this is a case of providers who allegedly ignored a patient's complaints, refused to treat the patient, and/or failed to refer the patient to a doctor where there was sufficient evidence that a serious risk of harm existed, and that the provider was aware of that risk.

stomach and chest, and continued to have difficulty breathing. On his second visit to WSR, plaintiff reported the same symptoms, and also claims that the nurse called a female Sergeant at the prison and told her that he was just trying to obtain pills.[13] It appears that plaintiff was not examined or treated on the second visit.

The Department of Corrections requires that emergency medical care be available 24 hours a day, and that offenders needing emergency care be referred to a licensed provider or an emergency room. Dkt. # 53 (Ex. B to Wayne Decl. at 18 ¶ D). The policy states that "[u]nder no circumstance will any offender reporting a health emergency be denied access to health care, including appropriate evaluation, due to suspicion of or a history of abuse of the emergency system." *Id.* Given this policy, the nurse's unsolicited call to a Sergeant at the prison stating that plaintiff was only trying to obtain pills provides evidence of intent for why his complaints were ignored and no treatment or examination was conducted on the second visit, and why only a rudimentary examination by Nurse Jones was provided on the first visit.

Viewing the facts in the light most favorable to plaintiff, the court finds that plaintiff has raised a triable issue of material fact with respect to whether Nurse Allbert and Nurse Jones were deliberately indifferent to plaintiff's medical needs.

3. <u>Nurse Hutchins</u>

On March 8, 2009, plaintiff declared his third medical emergency, and arrived at the WSR in a wheelchair. Plaintiff told Nurse Hutchins that he was in severe pain and could not breathe. Nurse Hutchins took his vital signs, and found them to be within normal limits. She told plaintiff that he was not acutely ill, and that he could not go to the emergency room. She also told him that walking would be good for him. Nurse Hutchins claims that she had not previously seen plaintiff or heard of him. Dkt. # 37

---

[13] It is unclear to the court which nurse made this call. Defendants have not provided any evidence that dispute that this call was placed.

(Hutchins Decl.) ¶ 3. However, it appears that Nurse Hutchins had access to plaintiff's medical file because she knew that he had already received a chest x-ray. The court does not have sufficient information before it to determine whether Nurse Hutchins was aware of facts in plaintiff's medical file from which the inference could be drawn that a substantial risk of serious harm existed. Defendants bear the burden of proving a qualified immunity defense, and Nurse Hutchins has not met her burden.

## IV. CONCLUSION

For all the foregoing reasons, the court DENIES the individual Defendants' motion for summary judgment. Dkt. # 32. Having ruled on the issue of qualified immunity, defendants' motion to stay discovery and for protective order is MOOT. Dkt. # 29.

Dated this 5th day of April, 2012.

_____
The Honorable Richard A. Jones
United States District Judge